UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                            Criminal No. 14-387 (PJS/FLN)

                 Plaintiff,

         v.                              **REPORT AND**
                                           **RECOMMENDATION**

Marvin Orlando Johnson**,**

                 Defendant.

_____

Thomas Calhoun-Lopez, Assistant United States Attorney, for Plaintiff.
Douglas Olson, Assistant Federal Defender, for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on February 3, 2015 on Defendant's motions to suppress (ECF Nos. 24–26). The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The government called five witnesses: (1) Eden Prairie Police Officer Cory Sinon; (2) ATF Special Agent Liane Sellner; (3) Eden Prairie Police Officer Bradley Miles; (4) Eden Prairie Police Detective Christopher Millard; and (5) Eden Prairie Police Detective Andrew Rohde. Additionally, the government entered three exhibits into evidence: the search warrant application, supporting affidavit, and return for 12710 Overlook Rd ( Gov. Ex. 1); the search warrant application, supporting affidavit, and return for 2631 Columbus Avenue S., Apt. # 104 (Gov. Ex. 2); and a search warrant and supporting affidavit for DNA samples from the Defendant (Gov. Ex. 3). For the reasons that follow, the Court recommends that Defendant's motions be **DENIED**.

## I.   FINDINGS OF FACT

In the early morning hours of November 4, 2014, a delivery truck driver, G.K., was

approached by a male individual with a gun when making a delivery to a Walgreens store located in Eden Prairie, Minnesota. G.K., described the suspect as a black male wearing a ski mask. The suspect ordered G.K. to let him inside the back entry of the Walgreens and G.K. complied.

Once inside the Walgreens with G.K., the suspect encountered the store manager, B.G. The suspect instructed the store manager to take him to the office, where the individual ordered B.G. to empty the contents of the store's safe into a garbage bag. B.G. also identified the suspect as a black male and described him as wearing jeans and a hooded jacket. B.G. also recalled that the suspect wore a mask obstructing the lower portion of his face and particularly remembered the suspect's blood shot eyes. After emptying the office safe and leaving the manager's office, the suspect encountered a Walgreens cashier stocking the shelves, C.B. The suspect then directed all three witnesses to the back stock area and instructed the witnesses to lie down as he exited through the back of the store. C.B. also remembered the individual as having black skin, wearing a dark hooded jacket, and that a garment obstructed the lower half of the suspect's face.

Eden Prairie police officers were notified of an armed robbery in progress at the Walgreens. Upon approaching the Walgreens, Eden Prairie law enforcement spotted an individual with a bag running from the store. Police Officer Cory Sinon and another law enforcement officer pursued the individual on foot towards a wooded area between the Walgreens and a nearby apartment complex. The individual running, later identified as Defendant, slipped and fell a few yards from the wooded area, at which point Officer Sinon was able to catch up with the individual. As he approached Defendant, Officer Sinon asked "Where is the gun?" Defendant replied, "I don't have one." Defendant was handcuffed and officers escorted him to a squad car. Defendant then stated "I fucked up. You guys doing an investigation of Walgreens or what? How did you catch me?"

The three robbery witnesses—the delivery driver G.K., Walgreens manager B.G., and Walgreens cashier C.B.—were subsequently interviewed by law enforcement officials. Shortly thereafter, the witnesses were taken to the Eden Prairie police station to participate in the suspect identification process. Eden Prairie law enforcement orchestrated a show-up outside the garage door entrance of the police station. Defendant was positioned outside of a squad car in his street clothes and was handcuffed. An officer separately drove each witness by Defendant, illuminating Defendant with the squad car's headlights. All three witnesses identified the Defendant as the Walgreens robber. The witnesses each stated that they were confident with their identifications. The identification procedures took place within 45 minutes to an hour of the robbery.

On November 6, 2014, Defendant was transferred from the Hennepin County Jail to the Federal District Court building in Minneapolis to make an initial appearance on a federal complaint for possession of a firearm by a convicted felon. The transfer was effectuated by agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). While ATF agents processed Defendant's paperwork in the U.S. Marshal's holding area, Defendant inquired if ATF Special Agent Liane Sellner had spoken with his girlfriend. Defendant specifically asked Agent Sellner if she had told his girlfriend that he would "never see the light of day." Agent Sellner responded that she had not spoken with Defendant's girlfriend, but there was a possibility that it "could end up that way." Defendant then asked, "for one gun?" Agent Sellner responded by stating, "yes, for one robbery." Defendant then proclaimed, "Man, I've been doing this my whole life."

Subsequent to Defendant's arrest, police officers secured search warrants for two locations associated with Defendant: (1) the residence of Defendant's girlfriend located in Dayton, Minnesota (Gov't Ex. 1); and (2) the residence of Defendant's aunt located in Minneapolis (Gov't Ex. 2).

## II.   CONCLUSIONS OF LAW

### A.   Defendant's motion to suppress eyewitness identifications (ECF No. 24)

Defendant argues that the show-up procedure that occurred at the Eden Prairie Police Station after his arrest violated his due process rights because it was unduly suggestive and provided for an unreliable identification.

An eyewitness's pretrial identification of a defendant is admissible "unless it is based upon a pretrial confrontation between the witness and the suspect that is both impermissibly suggestive and unreliable." *United States v. Martinez*, 462 F. 3d 903, 910 (8th Cir. 2006). Assuming, without deciding, that the show-up procedure utilized by law enforcement in this case was impermissibly suggestive, the Court concludes that the show-up is still admissible as it was not unreliable. *See United States v. Hines*, 387 F.3d 690, 694 (8th Cir. 2004) (assuming than an identification procedure was unduly suggestive and addressing only whether the identification was unreliable).

 "An identification is unreliable if its circumstances create 'a very substantial likelihood of irreparable misidentification.'" *United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998) (quoting *Brodnicki v. City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996)). In *United States v. Jones*, the Eighth Circuit identified certain factors to consider when evaluating the reliability of out-of-court identifications:

> An identification is unreliable if its circumstances create a very substantial likelihood of irreparable misidentification. The relevant circumstances include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation.

535 F.3d 886, 891 (8th Cir. 2008) (internal citations and quotation marks omitted).

Here, upon examining these factors and considering the totality of the circumstances, the

Court finds that the show-up procedure utilized in this case was sufficiently reliable to avoid a high likelihood of misidentification. All of the witnesses were in close proximity to the robber, with the delivery truck driver G.K and store manager B.G. spending several minutes with the robber in the manger's office while the store's safe was emptied. Each witness provided independent and generally accurate descriptions of the Defendant; the witnesses all described the robber as male with dark skin, with B.G. and store cashier C.B. recalling that the robber wore a dark hoodie or jacket. Although there appears to be some discrepancy among witness descriptions regarding what covered some of the robber's face—G.K and B.G identified it as a ski mask, whereas C.B. reported that the robber's lower face was covered by a garment of some kind—the Court finds such a slight distinction negligible as the witnesses all described something obstructing the lower portion of the robber's face. Additionally, B.G. specifically noted during the show-up procedure that he remembered Defendant's blood shot eyes. Moreover, each witness reported being very confident in their identification of Defendant, G.K. in fact stated that he was 100% sure that Defendant was the same individual he encountered in the robbery. Finally, the show-up procedure took place within 45 minutes to an hour of the crime occurring. For all of these reasons, the identification procedure was not unreliable and is therefore admissible. The Court recommends that Defendant's motion to suppress identification procedures be denied.

      **B.**      **Defendant's motion to suppress evidence obtained as a result of search and seizure (ECF No. 25)**

Defendant moves to suppress evidence seized pursuant to two search warrants: (1) a warrant for the residence of Defendant's girlfriend, M.S., located at 12710 Overlook Road in Dayton, Minnesota and for two vehicles—a 2006 Toyota Corolla and a 2008 Chevrolet Malibu—associated

with Defendant's girlfriend (Gov. Ex. 1), and (2) a warrant for 2631 Columbus Ave South in Minneapolis, Minnesota, the residence of Defendant's aunt.[1] ECF No. 25. Defendant argues that the probable cause section of the two warrants "contains speculation and conjecture that there would be evidence of a crime." Mem. in Supp. of Mot. to Suppress 5, ECF No. 32. The Government first contends that Defendant lacks standing to challenge the search warrants as neither of the residences belong to him. *See United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999) ("[T]he person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept."); Gov't Resp. Mem. 8, ECF No. 34. Further, the Government maintains that even if Defendant does have standing to challenge the searches, the supporting affidavits contained sufficient probable cause to conduct both searches and, moreover, the good faith exception is applicable here. *Id*. at 9–10. The parties made no arguments regarding Defendant's relationship to the two residences—the Government's memorandum only indicates that the residences were registered to Defendant's girlfriend and aunt. Without knowing Defendant's history with the residences, the Court will assume, without deciding, that Defendant maintains standing to challenge the warrants and subsequent searches.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A valid search warrant must be supported by an affidavit providing the signing judge with a substantial basis for determining the existence of probable cause to believe a search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462

---

[1]

Defendant originally challenged a warrant for Defendant's DNA (Gov. Ex. 3), but has subsequently withdrawn that challenge. ECF No. 32 at 5.

U.S. 213, 236-39 (1983).  Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. A supporting affidavit that consists of bare conclusions or conclusory allegations cannot support a finding of probable cause. *Id.* Whether probable cause exists depends on the totality of the circumstances. *Id.*; *United States v. Gabrio*, 295 F.3d 880, 882-83 (8th Cir. 2002). In evaluating the existence of probable cause, courts do not consider each piece of information independently, but instead consider the cumulative meaning of all facts taken together. *See United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002).

Here, the information contained in both supporting affidavits provided sufficient probable cause for the search warrants to be issued. Both affidavits detail the facts surrounding the November 4, 2014 robbery. The affidavit for the Dayton residence of Defendant's girlfriend M.S. indicates that Defendant visited with M.S. the night prior to the robbery at her residence, and early the next morning she drove with Defendant in her 2006 Toyota Corolla to the parking lot of an apartment building whereupon Defendant left the vehicle. The affidavit states that M.S. later heard police responding to the area. Additionally, the affidavit details that nine similar robberies had occurred over the last month, including incidences where the suspect was reported as wearing a mask similar to that from the movie "Scream." The affidavit reports that M.S. admitted that a "Scream" mask was located somewhere at her residence. Similarly, the supporting affidavit for the Minneapolis residence of Defendant's aunt states that the previous search conducted of M.S.'s residence produced ammunition and a Scream mask. It also states that M.S. told law enforcement officers during the search that Defendant was staying at his aunt's apartment and that he had personal belongings located at that residence.

The facts stated on each supporting affidavit establish more than a "fair probability" that evidence related to the Walgreens robbery would be found in the residences of Defendant's girlfriend and aunt. The Court concludes, given the totality of the circumstances described in each affidavit, that probable cause existed to support the issuance of the search warrants.

Even if the supporting affidavits for both search warrants lacked the requisite probable cause, the Court concludes that the evidence seized is nonetheless admissible under the good-faith exception to the exclusionary rule as articulated in *United States v. Leon*, 468 U.S. 897, 922 (1984). *See also United States v. Clay*, 646 F.3d 1124 (8th Cir. 2011) ("[T]he exclusionary rule should not be applied so as to bar the admission of 'evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate,' even if that search warrant is later held to be invalid." (quoting *Leon*, 468 U.S. at 900)). The courts have outlined four situations where an officer's reliance on a warrant would be unreasonable: (1) the officer included information in the affidavit that he knew was false or would have known was false except for his reckless disregard of the truth; (2) the affidavit is so lacking in probable cause that it is objectively unreasonable for the officer to rely on it; (3) the judge failed to act in a neutral and detached manner; or (4) the warrant is so facially deficient that the officer cannot reasonably presume the warrant to be valid. *United States v. Phillips*, 88 F.3d 582, 586 (8th Cir. 1996) (citing *Leon*, 468 U.S. at 923).

Defendant alleges that the second *Leon* exception applies here because "[a]n experienced law enforcement officer would have to have known that on the face of the warrant, it was deficient in terms of probable cause." ECF No. 32 at 7. The Court disagrees. This is not a situation where the supporting affidavit was so void of factual support that it would be objectively unreasonable for a law enforcement officer to rely on it. *C.f. United States v. Herron*, 215 F.3d 812 (8th Cir. 2000)

8

(concluding that the good-faith exception did not apply where the affidavit at issue contained no facts that the defendant was involved in marijuana activities or that such activities were occurring on the premises searched). Thus, to the extent Defendant's motion seeks to suppress evidence obtained from the two search warrants at issue, the motion should be denied.

### C. Defendant's motion to suppress statements, admissions, and answers (ECF No. 26)

A warning pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) is only required before a custodial interrogation or before conduct a police officer knows is "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). A suspect is in custody for *Miranda* purposes if "a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *United States v. Muhlenbruch*, 634 F.3d 987, 995–96 (8th Cir. 2011) (quoting *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007)).  In making this determination, courts consider "the totality of the circumstances that confronted the defendant at the time of questioning" and ask whether a reasonable person under such circumstances would have felt free to terminate the questioning and leave. *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

### 1. Defendant's statement at arrest

Defendant argues that his statement at the time of his arrest should be suppressed because Defendant was in custody at the time of the statement and had not yet been given a Miranda warning. ECF No. 32 at 3–4. The Government counters that the statement made by Defendant was a "spontaneous manifestation of his surprise," and not the result of questioning or statements made

by law enforcement officers. ECF No. 34 at 7. The Court agrees with the Government.

If a statement is made spontaneously and voluntarily—that is, not in response to law enforcement questioning—it is considered admissible regardless of whether or not a *Miranda* warning was issued. As the Eighth Circuit stated in *United States v. Withorn*, "We have repeatedly held that a voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." 204 F.3d 790, 796 (8th Cir. 2000) (quoting *United States v. Hatten*, 68 F.3d 257, 262 (8th Cir. 1995)). "*Miranda* has no application to statements that are voluntarily offered and not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." *United States v. Griffin*, 922 F.2d 1343, 1357 (8th Cir. 1990).

Here, although the Defendant was undoubtedly in custody at the time of arrest when this statement was made, the statement was spontaneous and not in response to law enforcement interrogation. The statement occurred after Officer Sinon chased Defendant on foot.  After Defendant tripped while running into a wooded area adjacent to the Walgreens, Officer Sinon was able to overcome Defendant. As Officer Sinon approached the Defendant on the ground, he asked where the gun was and Defendant responded that he did not have a gun. After this short exchange, Defendant was handcuffed and placed under arrest. Officer Sinon further testified that as he was escorting Defendant to his squad car, Defendant then made the statement at issue—"I fucked up. You guys doing an investigation of Walgreens or what? How did you catch me?"

The Court finds that this statement was not in response to any actions or questioning on behalf of law enforcement.  The only question Officer Sinon asked Defendant prior to the statement was if Defendant had a gun. Defendant responded that he did not. Thus, the exchange regarding the

location of a gun had concluded. It was only later, after Defendant had been handcuffed, placed

under arrest, and was being escorted to a squad car, that Defendant made the statement. Nothing in

the record supports the conclusion that the statement was made in response to some form of law

enforcement questioning. Rather, the statement was spontaneous and independent of the exchange

between Officer Sinon and Defendant regarding whether or not Defendant was armed.

However, even if the Court found that Officer Sinon's question about the location of a gun

constituted interrogation, the statement is still admissible under the public safety exception set forth

by the Supreme Court in *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, the Court held that

law enforcement officers may question a suspect without issuing a *Miranda* warning when it is

"necessary to secure their own safety or the safety of the public." *Id*. at 659. The application of the

exception is not reliant on the "questioning officers' subjective motivation." *United States v.*

*Everman*, 528 F.3d 570, 572 (2008). Rather, the exception is evaluated under an objective standard.

*Id*. Here, radio reports previously advised Officer Sinon of an armed robbery occurring at the

Walgreens. When Officer Sinon asked Defendant about the location of a gun, the public area was

unsecured and he was in the process of detaining Defendant. His question therefore falls well within

the public safety exception outlined in *Quarles*.

### 2. Defendant's statement at the Marshal's Service

Defendant also claims that a statement he made on November 6, 2014 while being processed

at the United States Marshal's office for a first appearance in United States District Court should be

suppressed.[2] Again, the Government maintains that this statement was a spontaneous utterance not

---

[2]

Defendant's motion identifies statements made "while in custody following his arrest" and
the Court heard testimony regarding the statement Defendant made while being booked at the
Marshal's office on November 6, 2014. *See* ECF No. 25. However, Defendant's post-hearing

solicited by police interrogation and is therefore admissible regardless of whether or not a *Miranda* warning was given. ECF No. 34 at 7–8.

Defendant was clearly in custody at the time of his statement while being booked in the Marshal's office and therefore the suppression question turns on whether the statement was spontaneous, or rather the result of the "functional equivalent" of an interrogation. *Rhode Island v. Innis,* 446 U.S. at 300-01. In other words, the *Miranda* safeguards apply not just to formal questioning, but "also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301.

In this instance, Defendant was transported from the Hennepin County Jail to United States District Court to make an initial appearance on a federal complaint by two ATF agents. Prior to his court appearance while being processed in the Marshal's office, Defendant initiated a conversation with ATF Special Agent Sellner. Defendant asked Agent Sellner if she had been the law enforcement officer who told his girlfriend that he would "never see the light of day." Agent Sellner denied speaking to Defendant's girlfriend but did stat "that it could work out that way" (i.e., that he could face a lengthy incarceration). Defendant then asked, "For one gun?" Agent Sellner replied, "Yes, for one robbery," at which point Defendant stated, "Man, I been doing this my whole life. I know the law."

The Court concludes that Defendant's statement was spontaneous and that Agent Sellner's actions were not likely to illicit incriminating responses by Defendant. Importantly, it was Defendant

---

memorandum does not specifically address this statement made in the Marshal's office. Nevertheless, the Court will address the merits of this suppression argument.

who initiated this brief exchanged with Agent Sellner. *See United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." (quoting *United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996))). Indeed, Agent Sellner only responded to questions asked directly to her by Defendant. Upon evaluating the circumstances of the exchange, the fact that Agent Sellner confirmed that Defendant could be facing a lengthy sentence was not objectively and reasonably likely to illicit an incriminating response. Defendant's motion to suppress as it relates to the statements made by Defendant on November 6, 2014 in the Marshal's office should therefore be denied.

## III.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, it is **HEREBY RECOMMENDED** that:

1. Defendant's motion to suppress eyewitness identifications (ECF No. 24) be **DENIED**;

2. Defendant's motion to suppress evidence obtained as a result of search and seizure (ECF No. 25) be **DENIED**; and

3. Defendant's motion to suppress statements, admissions, and answers (ECF No. 26) be **DENIED**.

## IV.   Trial Dates

The trial dates for this case are adjusted as follows:

1. This case is scheduled for trial on April 20 at 9:00 a.m. in Courtroom 14E, Minneapolis, before Judge Patrick J. Schiltz;

2. A status conference will be held on April 17, at 9:00 a.m. in Courtroom 14E, Minneapolis, before Judge Patrick J. Schiltz.  The government must submit its lists of prospective witnesses and prospective exhibits at this conference; and

2.      Trial briefs, voir dire questions, proposed jury instructions, and trial-related motions (including motions in limine) must be submitted to Judge Schiltz's chambers by 4:00 p.m. on April 8, 2015.  Responses to trial-related motions (including motions in limine) must be submitted by 4:00 p.m. on April 13, 2015.


DATED: March 13, 2015                          *s/Franklin L. Noel*
                                               FRANKLIN L. NOEL
                                               United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **April 1, 2015**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **April 1, 2015**  a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.

14